IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

MCMAHAN JETS, LLC,

        Plaintiff,

                    CIVIL ACTION
      v.               CASE NO. 2:11-cv-03112-WGY

ROADLINK TRANSPORTATION, INC.,
RIZO JET AVIATION SERVICES, LLC,
AND JOHN/JANE DOE,

        Defendants.

---

**FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT**

---

YOUNG, D.J.[1]                      December 18, 2014

## I.   INTRODUCTION

McMahan Jets, LLC ("McMahan") brings this diversity case against Roadlink Transportation, Inc. ("Roadlink"), Rizo Jet Aviation Services, LLC ("Rizo"), and John and Jane Doe, the purported owners of Roadlink. The case arises from the sale of a Cessna Citation Aircraft ("the Aircraft") by Roadlink to McMahan. The Aircraft is now, and was at the time of the sale, not airworthy. The central issue in this case is who should bear the loss: the grossly negligent seller or the nearly equally careless buyer?

---

[1] Of the District of Massachusetts, sitting by designation.

Much of the procedural history of this action has already been summarized by the Court in a previous opinion, <u>McMahan Jets, LLC</u> v. <u>Roadlink Transp., Inc.</u>, 926 F. Supp. 2d 999, 1001-02 (W.D. Tenn. 2013), and as such, will only be briefly limned here.

On November 10, 2011, McMahan filed a complaint in the Chancery Court of Shelby County, Tennessee. Compl. Breach Contract & Other Relief ("Compl."), ECF No. 1-2. Rizo timely removed on December 21, 2011. Rizo Jet Aviation Servs., LLC's Not. Removal & Mot. Dismiss Improper Venue, ECF No. 1. After entertaining various motions, on February 28, 2013, this Court denied Roadlink's motion to dismiss for lack of personal jurisdiction, and the case proceeded toward trial. <u>McMahan</u>, 926 F. Supp. 2d at 1005.

On November 25, 2013, Roadlink filed a motion for summary judgment on all counts, Accompanied by a memorandum and statement of material facts. <u>See</u> Mot. Summ. J. Roadlink Transp., Inc. ("Roadlink's Mot."), ECF No. 94; Am. Mem. Roadlink Transp., Inc. Supp. Mot. Summ. J. Compliance With Ct.'s Order Dec. 5, 2013 ("Roadlink's Mem."), ECF No. 97-1. McMahan responded on January 8, 2014. <u>See</u> McMahan Jets, LLC's Resp. Am. Statement Material Facts Filed Supp. Mot. Summ. J. Roadlink Transp., Inc. & McMahan Jets, LLC's Additional Material Facts ("McMahan's Resp."), ECF No. 98; McMahan Jets, LLC's Br. Opp'n Mot. Summ. J.

Roadlink Transp., Inc. ("McMahan's Opp'n"), ECF No. 99. Roadlink replied on January 15, 2014. See Reply Mem. Roadlink Transp., Inc. Supp. Mot. Summ. J., ECF No. 101.

This Court held a motion session on February 14, 2014, at which time it took the matter under advisement. Minute Entry, Feb. 14, 2014, ECF No. 102. Thereafter, the parties agreed to forego the summary judgment motion and to try the case to the Court. Minute Entry, Mar. 12, 2014, ECF No. 108. A two-day jury-waived trial ensued on May 1 and 2, 2014. Minute Entry, May 1, 2014, ECF No. 121; Minute Entry, May 2, 2014, ECF No. 122.

## II. FINDINGS OF FACT

The Aircraft is a Cessna Citation, a sleek swept-wing corporate jet with a posh passenger cabin that can accommodate four to five passengers in overstuffed chairs or couches. While the Aircraft was in service in Venezuela in the 1990s, CR Aviation of Orlando, Florida maintained the Aircraft. During this period, the interior passenger space was reconfigured, replacing two chairs with a couch situated atop the Aircraft's forward carry-through spar on the floor of the passenger compartment. The forward carry-through spar is a major structural component of an aircraft, being the wing spar in the center section within the fuselage and the attach point for the wings. As part of this reconfiguration, certain holes were bored in the forward carry-through spar to accommodate the speaker system for

the passenger compartment. Drilling such holes is not a major
alteration in an aircraft. A Styrofoam close-out panel was
fitted around the spar and the floor was then tastefully
carpeted (that is to say, the holes in the forward carry-through
spar were not visible to a casual inspection).

Unsurprisingly, aircraft -- as mechanically complex flying
objects -- are inspected. Although it does not appear on this
record that periodic inspections are required, various
inspections take place, most often when aircraft are bought and
sold. Inspections can be at various levels of detail, from
cursory to very detailed. The most detailed type of inspection
is a "phase 1-5 inspection." This most detailed type of
inspection is expensive, with estimates varying -- dependent on
aircraft type, age, and history of defects -- from $35,000 to
over $100,000. Everyone agrees that a phase 1-5 inspection is
sufficiently thorough to reveal the holes in the forward carry-
through spar.

And so it was with this Aircraft. During a phase 1-5
inspection in 2000, CR Aviation had discovered the several holes
drilled in the Aircraft's forward carry-through spar. CR
Aviation nevertheless issued an airworthiness certificate.
Similarly, in 2001, Sierra-NA ("Sierra") performed another phase
1-5 inspection.

While it was owned by Roadlink, the Aircraft underwent at least two further phase 1-5 inspections. Cliff Gottschalk ("Gottschalk") was Roadlink's Director of Avionics. A skilled FAA-certified mechanic, he himself performed a phase 1-5 inspection on the Aircraft in 2004 and again in October 2007. In the course of the 2004 inspection, he noted "holes in fwd spar [i.e. the forward carry-through spar]," but said "previously OK'd by CR Aviation and Sierra-NA" and returned the plane to service as airworthy. An experienced pilot, Gottschalk flew this Aircraft for approximately 250 hours both before and after these two inspections.

Enter Dr. Lynn McMahan ("Dr. McMahan"). Dr. McMahan is a successful physician and resident of Hattiesburg, Mississippi with a penchant for flying. Earning his pilot's license in 1998, McMahan had twenty to thirty hours of "second seat," or co-pilot, flying in Cessna Citations by 2007. He liked the Citation model and, wanting a plane with the ability to fly from Mississippi to the West Coast, he told his mechanic to start looking. Then, in November 2007, McMahan himself saw the Aircraft in Uvalde, Texas and commenced inquiries seeking to purchase it.

At this time, the Aircraft was in for maintenance by Sierra. Manuel Rizo ("Rizo") was an FAA-certified aircraft mechanic employed by Sierra. Rizo got a call from Xavier Barrios

("Barrios"), who said, "A Doctor is looking at [the Aircraft]. Is it for sale?"

Rizo called Gottschalk, with whom he was acquainted. Gottschalk got back to him, saying, "Flying J [a Roadlink subsidiary] would take an offer." Sensing a financial opportunity, Rizo set himself up as a broker for Roadlink. This was the first time he had ever acted in that capacity.

On his part, Dr. McMahan, having now focused his interest on the Aircraft, asked his pilot Paul Daughtry ("Daughtry") to help him with the purchase of the Aircraft. Daughtry took upon himself the role of broker for McMahan, and a faithless agent he proved to be.

Rizo knew that Roadlink wanted $1,900,000 for the Aircraft. Daughtry knew Dr. McMahan was willing to pay $2,100,000 for the Aircraft. Rizo and Daughtry agreed that they would structure a sale from Roadlink to Rizo[2] for $1,900,000 and from Rizo to McMahan for $2,100,000.[3] Unbeknownst to McMahan, the two would then split the $200,000 spread, characterizing it as a broker's fee. While the record is unclear on the point, it appears Roadlink was willing to go along with this arrangement to avoid paying Rizo a broker's commission.

_____

[2] Actually Rizo Jet Aviation Services. Rizo did business under this name.

[3] Actually McMahan Jets, LLC ("McMahan"), an entity controlled by Dr. McMahan.

Rizo and Daughtry then drafted the two contracts from other aircraft purchase and sale agreements with which they were familiar. The two contracts are in all material respects –– save for purchase price –– mirror images of each other.[4]

On January 10, 2008, McMahan entered into the purchase agreement (the "Agreement") with Rizo. See Roadlink's Mot., Ex. F, Aircraft Purchase Agreement Rizo Jet Aviation Servs. LLC ("Agreement"), ECF No. 94-8. This Agreement set the purchase price of the Aircraft at $2,100,000. Id. § 2.1. The Agreement contains several clauses germane to this action.

First, it set out a "Pre-Purchase Inspection" process, whereby the Agreement was "subject to Purchaser's pre-purchase inspection," including a test flight. Id. § 3.1. The Agreement also obligated the seller to "provide copies of logbooks, engine covers and other Aircraft accessories for inspection," and to "deliver the Aircraft for the pre-purchase inspection with all systems, functioning normally and in compliance with all Airworthiness Directives and Mandatory Service Bulletins." Id. § 3.2. After completing the inspection, McMahan would then provide a "list of discrepancies" to the Seller, who would have "[five] business days to review the list" and either "(a) pay to have the Airworthy discrepancies repaired at Seller's expense and to

---

[4] Roadlink wisely stands behind its contractual undertaking and –– equally wisely –– raises no privity defense.

complete the sale; (b) reduce the Purchase Price of the Aircraft

to Purchaser's satisfaction; or (c) to decline to pay the costs

of defined Airworthy discrepancies and to terminate this

Agreement." Id. After the inspection, the purchaser was to "sign

a Technical Acceptance Letter," which would list the relevant

discrepancies. Id. § 3.3. The final decision to proceed with the

agreement was McMahan's -- as "[a]cceptance or non-acceptance of

the Aircraft [was to] be at Purchaser's sole discretion." Id. §

3.4.

Second, the Agreement set out three warranty conditions.

The Agreement stated that the:

> Aircraft will be delivered "AS IS WHERE IS", subject
> to the Seller's satisfaction of the conditions of
> Section 3.2, if necessary, with all available log
> books, ground covers, operating manuals, loose
> equipment, wiring diagrams and all pertinent paperwork
> relating to the Aircraft in Seller's possession.
> Seller is unaware of any major damage suffered to the
> Aircraft.

Id. § 6.1. The Agreement expanded upon that disclaimer in a

subsequent section, stating that:

> The Aircraft is being sold without any warranty from
> Seller or any original equipment from the manufacturer
> of the Aircraft, Cessna Aircraft Corporation. Seller
> acknowledges that Purchaser has had full opportunity
> to inspect the Aircraft and to have such tests and
> inspections performed by third parties as the
> Purchaser deems necessary or desirable, in Purchaser's
> sole discretion. Purchase is at Purchaser's sole
> discretion, and Purchaser understands that this is a
> final sale. . . . Purchaser understands, agrees and
> accepts that Seller is selling the Aircraft and it's
> [sic] equipment "AS IS, WHERE IS" with all faults

8

and/or deficiencies, provided however, that Seller, has satisfied the condition of Section 3.2, if necessary. NO WARRANTIES OF ANY TYPE WHETHER OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, EXPRESS OR IMPLIED, IN FACT OR BY LAW, IS OR SHALL BE APPLICABLE TO THE Aircraft, THE CONDITION OF THE AIRCRAFT, OR ITS PARTS OR ACCESSORIES.

Id. § 6.3. That said, the Agreement also stated that "Seller shall deliver Aircraft from the Pre-Purchase Inspection with all systems functioning normally and all Airworthiness Directives complied with, Mandatory Cessna Service Bulletins, recommended Cessna Phase Inspections and in Airworthy Condition prior to delivery and acceptance of the Aircraft." Id. § 6.2.

During the closing process, McMahan conducted a pre-purchase inspection, although he did not conduct a more comprehensive phase 1-5 inspection. Instead, relying on Gottschalk's recent phase 1-5 inspection in October 2007, Dr. McMahon engaged Barrios to conduct a "cursory" inspection of the Aircraft and to review the logbooks. Barrios was provided with the Aircraft's logbook, which documented the two inspections in 2000 and 2001, conducted by CR Aviation and Sierra respectively, as well as the two inspections conducted by Gottschalk in 2004 and 2007.

The final agreement was executed, and delivery occurred, on January 24, 2008. McMahan operated the aircraft normally for twenty-two months. Then, in November 2009, the Aircraft was inspected by the Cessna Citation Service Center in Orlando,

Florida. When it discovered the holes in the Aircraft's forward carry-through spar, Cessna concluded that, because of these holes, the Aircraft was not airworthy. The Aircraft was flown back to Mississippi where it has been stored ever since. This litigation soon ensued.

## III. RULINGS OF LAW

### A. Choice of Law

As a preliminary matter, the parties dispute whether the Court ought apply the law of Tennessee or the law of Mississippi to this action. When this Court sits in diversity, questions of choice of law are governed by the laws of the forum state -- in this case, Tennessee. <u>Montgomery</u> v. <u>Wyeth</u>, 580 F.3d 455, 459 (6th Cir. 2009).

#### 1. Contract Claims

Because this action deals with the sale of a good, the Court looks to Tennessee's Uniform Commercial Code (the "Tennessee UCC") to determine the appropriate choice of law test to apply to McMahan's contract claims. When the parties do not agree on which law ought govern their agreement, the Tennessee UCC holds that the substantive law of Tennessee applies "to transactions bearing an appropriate relation to this state." Tenn. Code. Ann. § 47-1-301(b). Factors guiding the Court's application of this test may include (1) where the good in question was produced, (2) where delivery took place, (3) where

the majority of negotiations took place, and (4) where the
defendant's principal place of business is located. See, e.g.,
Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply
Co., 823 F. Supp. 2d 786, 801 (W.D. Tenn. 2011) (relying on such
factors).

Both McMahan and Roadlink concede, however, that choice of
law has no bearing on the breach of contract issues raised in
this action. The parties' substantive arguments and the Court's
analysis rely only on contract principles that are common to
both Tennessee and Mississippi. Moreover, all relevant
provisions of the Uniform Commercial Code have been adopted in
both states. Because the Court's analysis will apply with equal
force regardless of which law formally applies, there is little
need for the Court to look beyond the presumption in Tennessee
law that a contract is governed "with reference to the law of
the place where it was entered into." Deaton v. Vise, 210 S.W.2d
665, 668 (Tenn. 1948). Since that place was Memphis, Tennessee,
the site of delivery, the Court rules that for the purposes of
this motion, it will apply the law of the forum state,
Tennessee, to McMahan's contract claim.

### 2. Tort Claims

McMahan's tort-based claims require a different approach,
although similar choice of law considerations are at play. The
parties agree that the differences between Tennessee and

Mississippi law do not affect either side's substantive arguments as to whether Roadlink committed negligent or intentional misrepresentation. Mot. Hr'g Tr., Feb. 14, 2014, 7:17-8:18. Choice of law will affect, however, the extent of McMahan's potential recovery. Whereas Tennessee courts permit the recovery of purely economic losses in cases of negligent misrepresentation, Mississippi courts have recognized the economic loss doctrine barring recovery in tort for such damages. Compare John Martin, Co., Inc. v. Morse/Diesel, Inc., 819 S.W.2d 428, 431 (Tenn. 1991) (holding that in negligent misrepresentation actions, Tennessee law applies the standards found in the Restatement (Second) of Torts § 552 (1977), which allow for recovery of pecuniary losses), with State Farm Mut. Auto. Ins. Co. v. Ford Motor Co., 736 So. 2d 384, 387-88 (Miss. Ct. App. 1999) (adopting the economic loss doctrine). Thus, although the Court's analysis of the tort claims raised in this action again will apply with equal force regardless of which state's law governs, the Court undertakes the following choice of law analysis mainly to determine the scope of McMahan's potential recovery.

In Tennessee, choice of law in tort claims is determined by the "most significant relationship" test, as explicated by the Restatement (Second) of Conflict of Laws. Hataway v. McKinley, 830 S.W.2d 53, 59 (Tenn. 1992). Per that text, the law of the

state with "the most significant relationship to the occurrence

[at issue] and the parties" will govern. Restatement (Second) of

Conflict of Laws § 145(1) (1971). The Restatement further

provides:

> Contacts to be taken into account . . . to determine
> the law applicable to an issue include:
>> (a) the place where the injury occurred,
>> (b) the place where the conduct causing the
> injury occurred,
>> (c) the domicil, residence, nationality, place of
>> incorporation and place of business of the
>> parties, and
>> (d) the place where the relationship, if any,
> between the parties is centered.
> These contacts are to be evaluated according to their
> relative importance with respect to the particular
> issue.

Id. § 145(2).

These factors point more to Tennessee than they do to

Mississippi. The only undisputed facts connecting this case to

Mississippi are that McMahan Jets LLC is a Mississippi legal

entity and that it does at least some of its business from that

state. Tennessee, on the other hand, is where ownership of the

aircraft changed hands. At that point, McMahan became the owner

of an aircraft with holes drilled into its spar, even though

McMahan believed it was paying for an aircraft with no such

damage. Its alleged injury therefore occurred in Tennessee.[5]

_____

[5] Roadlink's assertion that McMahan "felt" its damages in
Mississippi, Roadlink's Mem. 3, lacks support in the factual
record, as this statement is undermined by the fact that Dr.

Although much of the conduct giving rise to that injury -- the alleged misrepresentations made by Roadlink -- occurred during an inspection process taking place outside of Tennessee, that activity also occurred outside of Mississippi, since the aircraft and its logbooks -- which failed to mention spar damage -- were inspected in Texas. Moreover, Tennessee is where Roadlink had its last chance to mention or otherwise warn McMahan of the damage before the sale was finalized. Lastly, the Court determines that if any place can be considered the center of the parties' relationship, that place is Tennessee. McMahan and Roadlink mutually agreed to execute their transaction in Tennessee, and both parties sent agents to Memphis to do so. No other state, including Mississippi, has significant mutual contacts with the parties.

For these reasons, the Court concludes that Tennessee, not Mississippi, has the most significant relationship to Roadlink's alleged negligent and intentional misrepresentation. The law of Tennessee will therefore govern the resolution of these issues. If Roadlink is held liable for negligent misrepresentation, Dr. McMahan is eligible to recover even purely economic damages.

**B.    Breach of Contract**

---

McMahan first learned of the damage to the spar in Orlando, Florida, at the Cessna Citation Services Center.

McMahan's first claim against Roadlink is one for breach of contract. See Compl. ¶¶ 20-24. McMahan asserts that Roadlink and its co-Defendants "materially breached the Agreement by failing to deliver the Aircraft in an airworthy condition and falsely representing that the Aircraft was airworthy, structurally sound, safe and not unreasonably dangerous, among other things." Id. ¶ 23. Roadlink argues that under Sections 6.1 and 6.3 of the Agreement, McMahan purchased the aircraft "as is" and agreed to a number of additional disclaimers of Roadlink's liability.[6] See Roadlink's Mem. 4-5. McMahan contends that Section 6.2 of the Agreement commits Roadlink to delivering the aircraft in "Airworthy Condition," and that Roadlink failed to do so by delivering a plane with spar damage. See McMahan's Opp'n 12. For the following reasons, the Court concurs with Roadlink's understanding of its duties under the Agreement.

### 1.   Contract Construction

As was explained in the foregoing choice of law discussion, the Court need rely only on principles of contract interpretation common to both Mississippi and Tennessee to decide this issue. "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal

---

[6] The Court will refer to the Agreement's "as is" language and warranty disclaimers collectively as "the disclaimers," unless otherwise noted.

principles." Bob Pearsall Motors, Inc. v. Regal Chrysler-
Plymouth, Inc., 521 S.W.2d 578, 580 (Tenn. 1975); see also
Holland v. Mayfield, 826 So. 2d 664, 669 (Miss. 1999) ("In
interpreting any agreement the cardinal rule is to give effect
to the intentions of the parties."), abrogated on other grounds
by Harrington v. Office of Miss. Sec'y of State, 129 So. 3d 153
(Miss. 2013). Whether the parties' intentions are clearly
expressed in their contract is matter of law for the Court to
determine. See Royer Homes of Mississippi, Inc. v. Chandeleur
Homes, Inc., 857 So. 2d 748, 751 (Miss. 2003); Planters Gin Co.
v. Fed. Compress & Warehouse Co., Inc., 78 S.W.3d 885, 890
(Tenn. 2002). This is accomplished by applying rules of
construction to determine the parties' intent and resolve
possible ambiguities. See Royer Homes, 857 So. 2d at 752;
Planters Gin, 78 S.W.3d at 890. If ambiguities in the contract
remain, only then is their interpretation a matter of fact
committed to a factfinder. See Royer Homes, 857 So. 2d at 752;
Planters Gin, 78 S.W.3d at 890.

When the language of a contract is unambiguous, the Court
will not look beyond the four corners of the agreement. See
Kiser v. Wolfe, 353 S.W.3d 741, 748 (Tenn. 2011); Pfisterer v.
Noble, 320 So. 2d 383, 384 (Miss. 1975). The Court also will
"read the contract as a whole, so as to give effect to all of
its clauses." Brown v. Hartford Ins. Co., 606 So. 2d 122, 126

(Miss. 1992); see also Cocke Cnty. Bd. of Highway Comm'rs v.
Newport Utilities Bd., 690 S.W.2d 231, 237 (Tenn. 1985) ("[A]
contract must be viewed from beginning to end and all its terms
must pass into review, for one clause may modify, limit or
illuminate another."). In so doing, the Court accords words
their plain and ordinary meaning. See Allmand v. Pavletic, 292
S.W.3d 618, 630 (Tenn. 2009); Ferrara v. Walters, 919 So. 2d
876, 882 (Miss. 2005).

If it can do so reasonably, the Court will construe all
provisions in harmony with one another. See Guiliano v. Cleo,
Inc., 995 S.W.2d 88, 95 (Tenn. 1999); Pursue Energy Corp. v.
Perkins, 558 So. 2d 349, 352 (Miss. 1990). When two clauses are
in conflict, the clause consistent with the dominant purpose of
the contract controls. See Lamb Constr. Co. v. Town of Renova,
573 So. 2d 1378, 1383 (Miss. 1990) ("If one of two conflicting
clauses in a contract seems dominant, that clause should be
enforced."); Laurenzi v. Atlas Ins. Co., 176 S.W. 1022, 1026
(Tenn. 1915) (holding that the "term which expresses the chief
object and purpose of the contract must prevail, and
[conflicting] clauses containing provisions subordinate to the
chief object and purpose of the contract must give way").[7]

_____

[7] It is worth noting that authority for this rule is less
clearly articulated in Tennessee than it is in Mississippi.
Tennessee courts have long affirmed their loyalty to the rule,
attributed to Blackstone, that "[w]hen two clauses of a contract

17

## 2.    The Agreement at Issue

In the instant case, the potential for ambiguity exists because of the tension between the Agreement's disclaimers and its airworthy condition requirement. The prominence and breadth of the disclaimers in Section 6 evince an intent to protect Roadlink from liability for later-discovered defects of any kind, subject only to the satisfactory completion of the pre-purchase inspection process outlined in Section 3 of the Agreement. Such disclaimers signal to a purchaser that the seller makes no promises about the condition of his goods. But the airworthy condition delivery requirement does just the opposite by guaranteeing what seems to be a relatively high standard of quality, albeit one that is not defined and barely discussed elsewhere in the Agreement. It is not obvious to this Court that it can hold Roadlink to this standard while also

---

are in conflict, the first governs rather than the last." Bean v. Aetna Life Ins. Co., 78 S.W. 104, 104 (Tenn. 1903); see also, e.g., World Sales, Inc. v. Belz Investment Co., No. 02A01-9212-CH-00345, 1994 WL 8155, at *3 (Tenn. Ct. App. Jan. 13, 1994). It is clear that this rule best fits "regularly drawn" contracts, like deeds, in which the parties may have predictably stated their purpose and most important terms nearer to the beginning of the instrument as a matter of form. See Bean, 78 S.W. at 104-05. Given these origins, Tennessee courts have come to acknowledge that the rule only strictly applies when repugnant, irreconcilable clauses make it "impossible to ascertain the intention of the grantor." Teague v. Sowder, 114 S.W. 484, 494 (Tenn. 1908). Absent these circumstances, however, "it is probably more in consonance with authority" to enforce the clause most consistent with the chief purpose of the contract. Id. at 492 (quoting Bean, 78 S.W. at 105)).

honoring the full force of the protections Roadlink negotiated
for itself through the disclaimers.

### a. Airworthiness as a Condition Precedent to the Disclaimers

McMahan has no such difficulty reconciling these
provisions. It argues that "delivery of the Aircraft in an
airworthy condition, without major damage and with all phase
inspections completed, was a condition precedent to McMahan's
acceptance of the Aircraft in its 'as-is where-is' condition."
McMahan's Opp'n 14. McMahan relies on authority from the
Tennessee Court of Appeals endorsing a holistic approach to
determining whether contracting parties intended to make a
contractual provision a condition precedent. See Harlan v.
Hardaway, 796 S.W.2d 953, 957-58 (Tenn. Ct. App. 1990).

A closer reading of that same authority, however, convinces
the Court that it was not the clear intention of Roadlink or
McMahan to make the Aircraft's airworthy condition a condition
precedent to the disclaimers. In Harlan, the Tennessee Court of
Appeals observes that while no particular language is needed to
create a condition precedent, "the presence of a condition is
usually signaled by a conditional word or phrase such as 'if,'
'provided that,' 'when,' 'after,' 'as soon as,' and 'subject
to.'" Id. at 958. In fact, such conditional language does appear
in the instant Agreement. First, Section 6.1 states: "Aircraft

will be delivered 'AS IS WHERE IS', <u>subject to the Seller's satisfaction of the conditions of Section 3.2, if necessary</u> . . . ." Agreement § 6.1 (emphasis added). Second, Section 6.3 states: "Purchaser understands, agrees and accepts that Seller is selling the Aircraft and it's [sic] equipment 'AS IS, WHERE IS' with all faults and/or deficiencies, <u>provided however, that Seller, has satisfied the condition of Section 3.2, if necessary</u>." <u>Id.</u> § 6.3 (emphasis added). It is evident from the parties' choice of language and juxtaposition of provisions here that Roadlink and McMahan intended the successful completion of pre-purchase inspection to be a condition precedent to McMahan's acceptance of the aircraft "as is." In contrast, the requirement that the aircraft be delivered in airworthy condition appears at the end of a different section, unaccompanied by conditional language and unrelated to any of the disclaimers. <u>See</u> <u>id.</u> § 6.2. Given that "[c]ourts do not favor conditions precedent and will, as a general matter, construe doubtful language as imposing a duty rather than creating a condition precedent," <u>Harlan</u>, 796 S.W.2d at 958, the Court declines to rule that the Aircraft's airworthy condition was a condition precedent to the disclaimers. The provisions, as written, were intended to operate contemporaneously.

### b. The Meaning of "Airworthiness"

Roadlink, for its part, maintains that it fulfilled its commitment to deliver an aircraft in "airworthy condition." This argument relies on the premise that the phrase has an Agreement-specific meaning not directly related to passing a phase 1-5 inspection. See Roadlink's Mem. 7. The only other mention of the descriptive term "airworthy" is in Section 3.2 of the Agreement, in the context of McMahan's right of pre-purchase inspection. According to Roadlink, construing the contract as a whole requires the term "airworthy" in Section 3.2 to have the same meaning as in the phrase "airworthy condition" in Section 6.2 -- that is, meaning something like "with all problems identified by McMahan having been resolved." Id. This would mean, Roadlink says, that by resolving all of the airworthy discrepancies identified by McMahan prior to purchase (and there were none), Roadlink satisfied its Section 6.2 commitment to delivering the aircraft in airworthy condition. Id. Requiring more of Roadlink would render the "as is" language of the contract "meaningless," id. at 9, and "hopelessly in conflict with the rest of the contract," id. at 8.

The Court disagrees with this reading. While it is logical to assume that "airworthy" ought mean the same thing in Section 3.2 as in Section 6.2, the Agreement is not written in such a way that the former use of "airworthy" defines the meaning of the latter. The word is not expressly defined anywhere in the

Agreement. The use of "airworthy" in Section 3.2 merely signals
that pre-purchase inspection is directed to uncovering and
identifying the type of discrepancy that specifically goes to
the plane's airworthy condition. It does not bear on the meaning
of "airworthy condition" itself, and it is not true under this
Agreement that an aircraft automatically achieves airworthy
condition once all purchaser-identified discrepancies have been
addressed. If McMahan had failed to notice that the aircraft had
no wings, for example, it would be absurd to conclude that the
aircraft still ought be considered "airworthy" under the
Agreement despite lacking any capacity to fly.

Moreover, the term appears to be widely used in contracts
for the sale of aircraft and in the industry generally. See,
e.g., Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 778
(2d Cir. 2003) ("'Airworthy' is a term of art in the aviation
industry indicating that an [aircraft] is safe and that it
comports with FAA requirements."); JDI Holdings, LLC v. Jet
Mgmt., Inc., 732 F. Supp. 2d 1205, 1214 (N.D. Fla. 2010) (noting
that the term is "well understood by those in the aircraft
industry"); 14 C.F.R. § 91.7 (prohibiting operation of a civil
aircraft "unless it is in an airworthy condition," without
defining the term). One court recently surveyed existing case
law and expert testimony and concluded that the term has a
"generally accepted definition": an airworthy aircraft is one

"in a condition such that it could be safely operated during an immediate flight." Prichard Enters., Inc. v. Adkins, 858 F. Supp. 2d 576, 588 (E.D.N.C. 2012). While these precedents do not conclusively establish the meaning of "airworthy" in this case, they lead the Court to conclude that an Agreement adverting to "airworthiness" without explanation relies on the word's generally accepted meaning, not an Agreement-specific one.

The Court need not rule on the contours of that meaning here. It is undisputed that the Cessna Citation Services Center has grounded the aircraft as unairworthy because of the holes drilled in the carry-through spar. Roadlink also makes no attempt to argue that the aircraft meets objective criteria for airworthiness or that it could safely be operated in the state it was delivered. On this basis, the Court concludes that the Aircraft was not delivered to McMahan in an airworthy condition, in violation of the plain language of Section 6.2.

### c. The Significance of the Pre-Purchase Inspection

Whether the airworthy condition requirement ought be enforced at the expense of the disclaimers, however, is a different matter. Language in Sections 3 and 6 of the Agreement strongly suggests that the parties intended the pre-purchase inspection process to define the scope of Roadlink's technical obligations to prepare the Aircraft for delivery. For example,

Section 3.2 instructs that in response to the results of
McMahan's pre-purchase inspection, Roadlink may "have the
Airworthy discrepancies [identified by McMahan] repaired at
Seller's expense and . . . complete the sale." Agreement § 3.2.
This language imposes no obligation on the seller further to
inspect or repair the aircraft after the pre-purchase inspection
repairs have been made, implying that by repairing the
discrepancies identified by McMahan, Roadlink discharged all
repair duties that would stand in the way of a sale. Section
3.3, providing for McMahan to sign a Technical Acceptance Letter
approving of the aircraft's condition, expressly does not bind
McMahan "unless and until" Roadlink satisfactorily completes
pre-purchase inspection repairs. Id. § 3.3. No other condition,
such as airworthiness, mitigates the binding quality of
McMahan's acceptance.

Pre-purchase inspection is then referred to repeatedly in
the sections of the Agreement discussing delivery of the
Aircraft in its "as is" state. Recall that satisfaction of
Section 3.2 is the only condition precedent associated with the
disclaimers in Sections 6.1 and 6.3. The first three sentences
of Section 6.3 also read:

> The Aircraft is being sold without any warranty from
> Seller or any original equipment from the manufacturer
> of the Aircraft, Cessna Aircraft Corporation. Seller
> acknowledges that Purchaser has had full opportunity
> to inspect the Aircraft and to have such tests and

> inspections performed by third parties as the
> Purchaser deems necessary or desirable, in Purchaser's
> sole discretion. Purchase is at Purchaser's sole
> discretion, and Purchaser understands that this is a
> final sale.

Id. § 6.3 (emphasis added). Even the sentence actually containing the phrase "in airworthy condition" references pre-purchase inspection: "Seller shall deliver Aircraft from the Pre-Purchase Inspection with all systems functioning normally . . . and in Airworthy Condition . . . ." Id. § 6.2 (emphasis added). Such language again shows no intent that Roadlink was to be responsible for extra self-guided inspection or repair in between pre-purchase inspection repairs and delivery.

It is apparent from these numerous cross-references that the pre-purchase inspection requirements in Section 3 were intended to dovetail as neatly as they do with the disclaimers in Section 6. The effect of the interlocking provisions is to place the burden on McMahan to identify airworthiness problems before accepting the aircraft. This burden explains why once pre-purchase inspection was completed to McMahan's satisfaction, McMahan was required to sign a legally binding Technical Acceptance Letter: the parties intended the letter to constitute proof of satisfaction of the condition precedent to receiving the aircraft "as is," with all warranties disclaimed. Indeed, the purpose of including such comprehensive warranty disclaimers in Section 6.3 was to protect Roadlink from claims such as this

one, arising from later-discovered defects that McMahan had full
opportunity to discover and address during pre-purchase
inspection.

It cannot be the case that this deliberate arrangement is
to be overturned by the single use of the phrase "in Airworthy
Condition" at the end of Section 6.2. Not only do the words
stand remote from any disclaimer or significant discussion of
repair duties, they appear far less important to the Agreement
than do the pre-purchase inspection provisions or the
disclaimers. The phrase is used once, towards the end of a
paragraph primarily concerned with conditions ensuring a legally
unencumbered delivery, such as warranting the authority of
Roadlink's agent or clarifying the scope of Roadlink's duties if
purchase funds have not been fully transferred. The phrase is
also the fifth item in a list, and the rest of the list mostly
recites conditions that Roadlink already would have prepared in
advance of pre-purchase inspection, like ensuring compliance
with "all Airworthiness Directives." Agreement §§ 3.2, 6.2.
These drafting choices hardly call attention to the words "in
Airworthy Condition." This does not speak to a strong intent to
impose on Roadlink a considerable duty to repair wholly separate
from the pre-purchase inspection process.

To hold Roadlink to the words "in Airworthy Condition"
would fundamentally alter the allocation of risk established by

the jointly operating pre-purchase inspection provisions and
disclaimers. If the parties had intended Roadlink
unconditionally to guarantee the Aircraft's airworthy condition,
there would have been no reason to contract for pre-purchase
airworthiness inspection in such detail -- or at all, for that
matter, as McMahan would have had no reason to worry about being
forced to accept an unairworthy aircraft. There also would have
been little reason for Roadlink to disclaim a warranty of
airworthiness, as it did by prominently disclaiming "WARRANTIES
OF ANY TYPE WHETHER OF MERCHANTABILITY, FITNESS FOR A PARTICULAR
PURPOSE OR OTHERWISE." Id. § 6.3. McMahan's risk in accepting of
the aircraft "'AS IS, WHERE IS' with all faults and/or
deficiencies" would be very little indeed. Id. The Court
therefore holds that to the extent the phrase "in airworthy
condition" conflicts with the disclaimers, the disclaimers
control.

Although no cases specific to Tennessee or Mississippi
offer much aid in bolstering the Court's conclusion, Roadlink
cites two cases from other courts which are instructive. In
Pissed Away N6VC, LLC v. Stricker, No. 2:11-cv-04278-NKL, 2012
WL 393418 (W.D. Mo. Feb. 6, 2012), the district court considered
a contract for the sale of an aircraft in which the parties
provided for pre-purchase inspection, responsive repairs, and
subsequent acceptance of the aircraft "as is," with disclaimers.

Id. at *1. The contract also contained a seller requirement to "ensure flight worthiness." Id. The district court held, inter alia, that the contract's intent as a whole to insulate the seller from the risk of subsequent purchaser dissatisfaction prevailed over the contract's "flight worthiness" requirement and defeated the purchaser's breach of contract claim. Id. at *4-6. In N653CT, LLC v. Players Air, Inc., No. 2:07-CV-683, 2010 WL 520528 (D. Utah Feb. 8, 2010), the district court granted summary judgment against an aircraft purchaser on the grounds that the purchaser was bound by its acceptance of the aircraft under these contract terms:

> Acceptance of the Aircraft, as evidenced by a written receipt acknowledging delivery, shall constitute Purchaser's agreement that the Aircraft conforms to the specifications, standards and other requirements of this Agreement or is otherwise acceptable to Purchaser.

Id. at *4. The court held that "[h]aving agreed that the Aircraft is conforming and acceptable, [the purchaser] cannot now sue [the seller] claiming the Aircraft is nonconforming and unacceptable." Id. There are factual differences between Pissed Away, Players Air, and this case,[8] but not ones sufficient to

---

[8] For example, in Pissed Away, the "ensure flight worthiness" requirement in the contract at issue was part of a list of tasks the seller expressly promised to carry out after the buyer's acceptance. See Pissed Away, 2012 WL 393418 at *1. It was not an implied condition of delivery. But this requirement is even stronger than the airworthy condition

sway the Court's assessment that this Agreement's disclaimers

ought prevail and McMahan ought be bound by its acceptance of

the Aircraft "as is."

### C. Negligent and Intentional Misrepresentation

In its complaint, McMahan also advances counts of negligent

misrepresentation, intentional misrepresentation, and fraud.[9] See

Compl. ¶¶ 25-40. Both counts are based on representations that

Roadlink made in the logbook concerning the airworthiness of the

Aircraft. See id. ¶¶ 27, 36; see also Roadlink's Mem. 12. None

of these counts, however, survive under the laws of either

Tennessee or Mississippi.

---

requirement under consideration in the instant case, and it
still gave way to disclaimers.
    The Court also notes that whereas the Technical Acceptance
Letter signed by McMahan stipulates acceptance based on the fact
that no discrepancies were discovered during pre-purchase
inspection, the acceptance effected by the purchaser in Players
Air was not strictly an acceptance of that aircraft's technical
condition, since the purchaser could have accepted on the ground
that the aircraft was "otherwise acceptable." Players Air, 2010
WL 520528 at *4. The court in Players Air, however, treats the
purchaser's acceptance as a binding agreement that the aircraft
was conforming. Id. This Court accords the same treatment to
McMahan's acceptance.

[9] Under Tennessee and Mississippi law, both "fraud" and
"intentional misrepresentation" refer to the same action. See,
e.g., Hodge v. Craig, 382 S.W.3d 325, 342 (Tenn. 2012) ("In
fact, 'intentional misrepresentation,' 'fraudulent
misrepresentation,' and 'fraud' are different names for the same
cause of action." (citing Concrete Spaces, Inc. v. Sender, 2
S.W.3d 901, 904 n.1 (Tenn. 1999))); Moore v. Bailey, 46 So. 3d
375, 383 (Miss. Ct. App. 2010) (noting that fraud is "otherwise
known as intentional misrepresentation"). This Court thus
collapses these two counts for the purpose of this analysis.

## 1.  Negligent Misrepresentation

Both Tennessee and Mississippi define negligent
misrepresentation using substantially the same factors.
Critically, both states require the plaintiff to prove that he
reasonably or justifiably relied on the statements of the
defendant.[10]

Roadlink's first argument is that the term "airworthiness"
is an opinion, and thus not actionable under negligent
misrepresentation, which only concerns facts. Roadlink's Mem.
15; see also Spragins v. Sunburst Bank, 605 So. 2d 777, 780
(Miss. 1992) ("The first element of negligent misrepresentation,
misrepresentation of a fact, must concern a fact rather than an
opinion." (emphasis omitted)); Harrison v. Avalon Props., LLC,

---

[10] Compare Mladineo v. Schmidt, 52 So. 3d 1154, 1165 (Miss.
2010) (holding that two necessary elements of a negligent
misrepresentation claim are that "the plaintiff reasonably
relied upon the misrepresentation or omission; and . . . that
the plaintiff suffered damages as a direct and proximate result
of such reasonable reliance" (quoting Hazlehurst Lumber Co.,
Inc. v. Miss. Forestry Comm'n, 983 So. 2d 309, 313 (Miss.
2008))), with McNeil v. Nofal, 185 S.W.3d 402, 408 (Tenn. Ct.
App. 2005) ("To establish a prima facie case for negligent
misrepresentation, the plaintiff . . . must show that he
justifiably relied upon a material misrepresentation made by an
individual under a duty to properly inform as to the material
facts."); Williams v. Berube & Assocs., 26 S.W.3d 640, 645
(Tenn. Ct. App. 2000) (holding that in a negligent
misrepresentation case, "the burden is upon the plaintiff to
show that its reliance upon any statements defendants may have
made was reasonable").

246 S.W.3d 587, 601 (Tenn. Ct. App. 2007) (holding that a "statement of opinion . . . is insufficient to form the basis for a cause of action for misrepresentation").

There is some authority for the proposition that airworthiness is a matter of professional opinion. See Prichard Enters., 858 F. Supp. 2d at 587 (reporting testimony where a party stated that "different mechanics could have differing views and opinions on what is and is not airworthy" (internal quotation mark omitted)); JDI Holdings, 732 F. Supp. 2d at 1227 ("[T]he evidence shows that mechanics exercise judgment in determining whether a discrepancy involves an airworthy concern, and opinions may differ, as with most inspections."). Here, however, the entirety of the factual record convinces this Court that drilling these holes in the forward carry-through spar rendered the Aircraft not airworthy despite the opinions of CR Aviation and Sierra to the contrary. Even Gottschalk, who relied on these opinions to form his own judgment, admitted after the fact that the Aircraft was probably not airworthy.

Second, Roadlink points out that Dr. McMahan testified during his deposition that the fact that Gottschalk -- Roadlink's Director of Avionics -- had completed an inspection of the Aircraft was "'absolutely' concerning to him because . . . it demonstrated a 'conflict of interest' . . . [and] was akin to a 'fox guarding the hen house.'" Roadlink's Mem. 14 (quoting

Dep. Lynn Bryce McMahan 126:7-127:2, 136:10-13, ECF No. 109-3.
The Sixth Circuit has held that a key factor in determining
reasonable reliance is whether the party claiming such a cause
of action has an "apparent reason to doubt the veracity of [the
defendant's] representations." Academic Imaging, LLC v. Soterion
Corp., 352 F. App'x 59, 73 (6th Cir. 2009) (internal quotation
mark and brackets omitted). Roadlink thus argues that the fact
that McMahan had such doubts supports a conclusion that there
was no reasonable reliance.

In the end, it is the Agreement that saves Roadlink from
the negligent misrepresentation claim. Roadlink argues that
McMahan could reasonably not have relied on any airworthiness
certifications in the logbook because (1) the purchase agreement
stated that the sale was "as is, where is," and disclaimed all
warranties, and (2) because McMahan "had unfettered access to
inspect the Aircraft prior to purchasing it." Roadlink's Mem.
12-13.

Both Mississippi and Tennessee courts have held that the
presence of a disclaimer in a contract negates as matter of law
the reasonable reliance necessary for a finding of negligent
misrepresentation. See Hazlehurst Lumber Co., Inc. v. Miss.
Forestry Comm'n, 983 So. 2d 309, 313 (Miss. 2008) (holding that
"[i]n light of [a] disclaimer provision in the contract, [the
plaintiff] could not reasonably rely on the [defendant]'s

estimates"); <u>Stafford</u> v. <u>Emberton</u>, No. M2008-02250-COA-R3-CV, 2009 WL 2960391, at *3 (Tenn. Ct. App. Sept. 15, 2009) ("Exculpatory clauses are valid in Tennessee, and the agreement by the [plaintiffs] to accept the property 'as is' defeats any negligent misrepresentation claims. This is true since this 'as is' provision negates any reliance by the [plaintiffs] on the misrepresentation, which is an element of any misrepresentation claim." (internal citation and emphasis omitted)).

Moreover, regardless of which law applies, the fact that McMahan had the right to inspect the Aircraft also negates reasonable reliance as matter of law. <u>See</u> <u>Taylor</u> v. <u>S. Farm Bureau Cas. Co.</u>, 954 So. 2d 1045, 1050 (Miss. Ct. App. 2007) ("Courts in Mississippi have held that where a plaintiff has an opportunity to investigate the statements upon which she allegedly relied, the plaintiff cannot be said to have reasonably relied on those statements."); <u>Goodall</u> v. <u>Akers</u>, No. M2008-01608-COA-R3-CV, 2009 WL 528784, at *7 (Tenn. Ct. App. Mar. 3, 2009) (holding that "where the means of knowledge are readily available, and the vendor or purchaser, as the case may be, has the opportunity by investigation or inspection to discover the truth with respect with matters concealed or misrepresented, without prevention or hindrance by the other party, of which opportunity he is or should be aware, and where he nevertheless fails to exercise that opportunity and discover

the truth," the purchaser cannot show reasonable reliance for misrepresentation purposes (quoting <u>McNeil</u> v. <u>Nofal</u>, 185 S.W.3d 402, 409-10 (Tenn. Ct. App. 2005)) (internal quotation marks omitted)). Here, McMahan had such a contractual right, thus defeating reasonable reliance.[11] <u>See</u> Agreement §§ 3.1-3.3.

Thus, because the agreement contains both an "as is" clause, <u>id.</u> §§ 6.1, 6.3, and a clause giving McMahan the right to inspect the Aircraft before consummating the sale, <u>id.</u> §§ 3.1-3.3, and because each of these clauses independently negates the necessary element of reasonable or justifiable reliance, the claim of negligent misrepresentation must fail.

### 2. Intentional Misrepresentation

In order to bring a claim for intentional misrepresentation, Tennessee and Mississippi law both require, as the name suggests, intent on the part of the defendant: under the former, the defendant must knowingly or recklessly intend to

---

[11] In its brief, McMahan calls upon the Court to apply an eight-factor test for determining reasonable reliance. <u>See</u> McMahan's Opp'n 16 (quoting <u>Riddle</u> v. <u>Lowe's Home Ctrs., Inc.</u>, 802 F. Supp. 2d 900, 908 (M.D. Tenn. 2011)). When a right to inspection is implicated, however, Tennessee state courts have applied only the test identified <u>supra</u>, rather than the multi-factor test set out in <u>Riddle</u>. <u>See</u> <u>Goodall</u>, 2009 WL 528784, at *6-7.

make a false statement, and under the latter, the defendant must

intend to deceive the plaintiff.[12]

In this case, the evidence fails to convince this Court

that Roadlink, through Gottschalk, either intended to deceive

McMahan about the airworthiness of the Aircraft or apprehended

at the time of the sale that the Aircraft was not, in fact,

---

[12] Tennessee and Mississippi both impose an intent
requirement in fraud actions, but do so in different ways: the
former requires an intent to make a false statement, while the
latter requires an intent to deceive.
    Tennessee law explicitly requires that the defendant
knowingly or recklessly make a false statement in order for a
fraud claim to lie. See Hodge, 382 S.W.3d at 343 (plaintiff must
prove, inter alia, "that the defendant either knew that the
representation was false or did not believe it to be true or
that the defendant made the representation recklessly without
knowing whether it was true or false"); see also Hodges v. S.C.
Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992) (defining
recklessness as a situation in which a "person is aware of, but
consciously disregards, a substantial and unjustifiable risk of
such a nature that its disregard constitutes a gross deviation
from the standard of care that an ordinary person would exercise
under all circumstances").
    Mississippi law, however, requires that the defendant have,
inter alia, "knowledge of [the statement's] falsity or ignorance
of its truth," combined with an "intent that [the statement]
should be acted on by the hearer and in the manner reasonably
contemplated." Trim v. Trim, 33 So. 3d 471, 478 (Miss. 2010)
(quoting McCord v. Healthcare Recoveries, Inc., 960 So. 2d 399,
406 (Miss. 2007)). The Mississippi Supreme Court -- and,
following its lead, the Fifth Circuit -- have interpreted these
two elements as requiring an intent to deceive on the part of
the defendant. See Anderson Dunham, Inc. v. Aiken, 241 Miss.
756, 761 (1961) (stating that "the proof must establish an
intent to deceive"); Harvard v. Kemper Nat. Ins. Cos., 71 F.3d
876, at *3 (5th Cir. 1995) ("Under Mississippi law, a cause of
action for fraud requires proof of an intent to deceive."):
Mills v. Damson Oil Corp., 931 F.2d 346, 349 (5th Cir. 1991)
(holding that plaintiff must show defendants' "intent to deceive
regarding the supposed misstatements").

airworthy. Gottschalk testified that he had learned of the holes
in the spar in 2000, and had not seen holes in another aircraft
or Cessna technical specification before that time. McMahan's
Opp'n 5. Even so, "despite the presence of the holes in the
spar, CR Aviation issued an airworthiness certificate," and in
2001, Sierra informed him that the "holes in the spar were not a
problem" and also issued an airworthiness certificate. McMahan's
Resp. ¶¶ 45-46. Gottschalk also testified that he noted the
holes on a discrepancy form in 2004, but noted that they were
"previously ok'd" by Sierra and CR Aviation, and did not put the
discrepancy forms in the logbooks as was "[c]onsistent with
industry practice." Id. ¶¶ 47-48. Moreover, he also testified
that he "believed the holes did not affect the airworthiness of
the Aircraft," and that he "personally flew in the Aircraft for
approximately 250 hours over eight years," and that he "would
not have flown in the Aircraft, and he would not have allowed
his employers or their families to fly in the Aircraft, if he
had any belief that it was not airworthy." Id. ¶¶ 50-51.

    This evidence, which remains essentially uncontroverted,
does not support either an inference that Gottschalk believed
that the aircraft was not airworthy, or that he intended to
deceive McMahan into believing that the aircraft was airworthy.
Rather, the Court believes that the evidence supports the
opposite conclusion -- that Gottschalk believed the Aircraft was

airworthy. This belief would thus negate the intent-to-make-a-false-statement requirement under Tennessee law.

Turning to Mississippi law, McMahan must prove the requisite elements of fraudulent misrepresentation by clear and convincing evidence. Brothers v. Winstead, 129 So. 3d 906, 915 (Miss. 2014); see also id. (holding that the "clear and convincing" standard exceeds the "overwhelming weight of the evidence" standard (quoting In the Interest of C.B., 574 So. 2d. 1369, 1375 (Miss. 1990))). Here, McMahan does not put forth any direct evidence showing that Roadlink, through Gottschalk, had an intent to deceive. Nor is inferential evidence helpful: while a court may infer an intent to deceive "[w]here false and material statements are knowingly and willfully made," Edminston v. Schellenger, 343 So. 2d 465, 467 (Miss. 1977), here, all available evidence indicates that Gottschalk believed the Aircraft was airworthy when he made statements to that effect in the logbook. Without such knowingly false statements, and with Gottschalk having a basis for stating that the Aircraft was airworthy, this Court does not infer an intent to deceive. Cf. Sims v. Eiland, 57 Miss. 607, 611 (1880) (concluding that an action for deceit can lie if a defendant makes a "false statement knowing it to be false" or "represents as a fact that of which he has no knowledge and no well-founded belief," but not if defendant had "good faith" when he made the statements in

37

question (internal quotation mark omitted)). Thus, given the high evidentiary bar McMahan must hurdle, and the low evidentiary showing upon this record, the claim for intentional misrepresentation must fail under Mississippi law as well.[13]

**III. CONCLUSION**

For the foregoing reasons, McMahan's claims for breach of contract, negligent misrepresentation, intentional misrepresentation, and fraud fail. The Court thus need not reach the issue of whether rescission is appropriate. No cognizable claim having been established against any of the Defendants, judgment will enter for all Defendants.

**SO ORDERED.**

_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE

---

[13] Even had Gottschalk believed at the time of the sale that the Aircraft was not airworthy, under Mississippi law, judgment for Roadlink would still be appropriate because there would be no reasonable reliance. In cases of common law fraud, as here, "[c]ourts in Mississippi have held that where a plaintiff had an opportunity to investigate the statements upon which she allegedly relied, the plaintiff cannot be said to have reasonably relied on those statements." Taylor, 954 So. 2d at 1050. Here, McMahan had a contractual right to inspect the Aircraft, see Agreement §§ 3.1-3.3, thus negating any reliance on Gottschalk's statements.